Haight, J.
This action was brought to recover the amount of a policy of insurance issued by the defendant upon a dwelling house in Aitón, N. Y., which had been destroyed by fire. The defenses relied upon are:
First. That the building burned was not the building-mentioned in the application and survey, and insured by the policy issued.
Second. That at the time of issuing the policy the assured held a policy upon the building destroyed in the Glens Falls Insurance company, which was then in full force and effect, and which was not disclosed to the defendant at the time of making such insurance and that by reason thereof the policy issued never took effect as a valid policy upon the building destroyed.
Upon the first question, it is claimed that the court erred in not granting the defendant’s motion for a nonsuit, and that the verdict is against the weight of evidence. Upon this branch of the case the evidence on behalf of the plaintiff is, in substance, as follows: Thomas Landers testified that in the spring of 1873 he saw Mr. Cannon at the village of Afton; at the lower end of the village; that Miss Emmons, was with Landers in a buggy; that Mr. Cannon came across the road on foot and said, “Your policy on the mill house is about expired,” and wanted to know if I did not want it renewed; I said Mr. Northrop, of Sidney, had that business, and he said he had run away or left the country, *169 and he had his papers and was doing the business; I said I believed the policy was in the Glens Falls, and I thought the company was a good one, and I thought it would be as well to put it there again; he said he had not that company, but had another just as good, and that was the Watertown Fire; I do not recollect anything more taking place; he said he would see me again; to the best of my recollection I saw him again afterwards at my house; I think the fore part of June; he came there in regard to insuring this building, and we had some talk; he finally agreed to insure it; it was discussed whether the building was two-story or a story- and-a-half; I think he said the old policy was a story-and-a-half and he thought it should be a two-story house; and he gave his opinion that it was a square two-story house, and that it should be put in the policy so; and it was put in so; he said he would send a policy by mail, and the policy after-wards came to me by mail.” Mrs. Landers, Frank Landers and Miss Emmons gave evidence tending to corroborate the testimony of Mr. Landers.
The testimony of Cannon on behalf of the defense is to the effect that be was going to Aft on by Mr. Landers house, and that when he came in front of the house he saw Landers doing something across the road in the wagon house. That he stopped and said to Landers, “You have a policy of $800 that is about expiring in the Glens Falls Insurance company; which house is it on? That this was in 1873, about the first of August, and while Cannon sat there in the buggy, Landers pointed across the road and said, “That is the house that stands in the yard.” The house so pointed out by Landers was a story and a half tenant house sixteen by twenty-four, with a wing sixteen by twenty-four, having two chimneys. It was standing in the same yard with Landers dwelling house, about sixty feet northerly therefrom, with a barn in the rear of the dwelling. Cannon further testified that he made a diagram of the premises while sitting in the buggy in the presence of Landers, and that the description was given in answer to his question, which he took down in his memorandum, book. That he went home and subsequently drew the application with a diagram, and signed Landers name thereto, and forwarded the same to the company, who subsequently forwarded by mail to Landers the policy in question. It will thus be observed that there is a sharp conflict between the testimony of these witnesses. Landers and Miss Emmons testify that the conversation took place in the village of Afton whilst they were riding in a buggy, and that Cannon came across the street on foot, and that that conversation pertained to the mill house, so-called; whilst Can- *170 Ron’s testimony is to an occasion in front of Landers residence, and he was in a buggy, and that the conversation related to the tenant house near the Landers dwelling. This evidence was submitted to the jury, and the jury having; found in favor of the plaintiff, we must assume that it believed the testimony given on behalf of the plaintiff. It' further appeared from the undisputed evidence in the case that upon the other side of the highway, and some half a mile distant from the dwelling house, the plaintiff had a steam mill, and fifty-one icet therefrom was a house twenty by thirty feet, with sixteen-feet posts, two story high, which -was known and called the mill house, which was the house destroyed by fire, and that Landers had the mill house insured in the Glens Falls Insurance company for $800, and that the policy would expire May 1, 1874; that upon this tenant house, near his dwelling, he also had an insurance in the Glens Falls Insurance company for $800, expiring July 1, 1873. It further appeared that in ¿he summer of 1874, Landers procured another insurance policy for $800 upon the tenant house near his dwelling. Alt of these insurance policies ran for the term of three years.
The policy in question was number 5,001. It insured Thomas Landers, of Afton, in the county of Chenango, state of New York, against loss or damage by fire or lightning to the amount of $800, on the following property, “as described in the application and survey bearing even date herewith, and which is hereby referred to as forming apart of this policy, viz., $800.00 on his two-story dwelling house, Afton, N. Y.” The mill house being a two-story dwelling located in Afton, answers to the description given in the policy, but when we refer to the application and diagram introduced in ■ evidence, we find that it describes the tenant house located near the Lander’s dwelling, with the exception that it is described as a two-story house, when it is in fact but a story and a half. The question is thus presented as to which of these buildings it was intended to insure. There can be but little doubt that Landers understood and believed that this policy was issued upon the mill house, for subsequently and in 1874, other insurance was procured upon the tenant house. Neither of these policies permitted further insurance, and if both had been issued upon the tenant house, double insurance was effected, upon that house, making both void, and the mill house was left without any insurance. By the terms of the policy the application was made a part thereof, and if the application was authorized by Landers, he doubtless must be bound by it. The question as to whether or not he did authorize this application was submitted to the jury by the trial court, and the jury by its verdict has found that he did not. *171 The evidence upon this branch of the case is that to which we have already referred, and is ample to sustain the verdict in this regard. It is conceded that Landers never signed the application or diagram forwarded to the company; that he never saw or knew its contents until after the loss had occurred. Cannon did not testify that he even showed him the pencil memorandum and sketch that he made while sitting in the buggy, so that in case the jury believed the testimony of Landers as to the talk in reference to the mill house, we think it properly found that this application was not authorized. But it is claimed further, that even though Landers did not execute the application, or know its contents, still the policy received by him referred thereto, and was notice to him that there was an application and survey, and that it thus became his duty to inform himself in reference to the contents thereof. Whilst this rule may prevail under some circumstances, we are not prepared to indorse it as applicable to the case under consideration.
True, Landers said that he expected Cannon would make some application to the company for a policy. Cannon was the agent of the company to solicit for the company. He had had his talk with Cannon in reference to the policy, the amount and the description of the property, discussion having taken place as to how the house should be described. The company recognized and received verbal application as appears from the policy itself, wherein it provides, that: “ all statements and representations contained in any written or verbal application, survey, plan or description of the property therein insured, shall be taken and deemed to be warranties,” etc. Landers had made no written application, he had made a verbal one, and the verbal application included the description of the building and he might well have understood the application referred to in the policy as being the application made by him. The policy does not state that the application was in writing; the only inference to that effect is the expression: “ Bearing even date herewith; ” but this expression might properly have been used in a case where the application was oral, and the policy was issued or dated back to the date on which the oral application was made. It was not sufficient standing alone to charge Landers with notice that there was a written application on file in the company’s office, upon which the company had issued its policy, when he knew that he had not signed or authorized any one to sign a written application for him.
Again, it is claimed that there was a mutual misunderstanding between the parties as to the building which was to be insured; that their minds never met on that subject *172 and consequently that there was no contract. But there is nothing in the evidence to sustain this claim. If the evidence of Cannon is to be taken as true, then the understanding and agreement was that the tenant-house was to be insured. If, however, the testimony of Landers is to be taken as true, then it was understood and agreed that the mill house should be insured. We do not deem it necessary to determine whether or not Cannon acted in good faith. If he intentionally forwarded to the company an application with a wrong description of the premises, then it would be perpetrating a fraud upon Landers, or if through carelessness and mistake he forwarded to the company an erroneous description, it was the mistake of the defendent, for which the plaintiff ought not to suffer.
Again, the policy contained the provision that: “If the insured shall have or shall hereafter make any other insurance on the property hereby insured, not indorsed thereon or consented to by this company, or its agent in writing, this policy shall be void. ” It is a conceded fact that at the time this policy was issued there was other insurance upon the building in the Glens Falls Insurance Company to the amount of $800, expiring May 1, 1874. The policy in suit would therefore be void unless the defendant accepted the insurance with full knowledge of the existence of the insurance in the Glens Falls Company under such circumstances as to estop it from claiming the benefit of this provision. Van Schoick v. Niagara Fire Insurance Company, 68 N. Y., 434; Richmond v. Niagara Fire Insurance Company, 79 id., 230.
Upon the question of knowledge we have the testimony of Landers, in which Cannon stated to him that Northrup, who had been the agent of the Glens Falls company, and had effected the prior insurance, had left the country, and that he (Cannon) had his papers and was doing the business, and that Landers’ policy on the mill house had about expired. Cannon himself testified that he had the books of Northrup, and that it contained the entries: “Thomas Landers, Glens Falls; number of policy, 197; property, Afton; $800.00; premium, $4.80; expiring 1st of July, 1873.” “Thomas Landers, Glens Falls Insurance Company; number, 351; farm property in Afton; $800.00; premium, $4.80; rate, 60 cents; expiring the 1st of May, 1874.”
To be sure there is a conflict in the evidence upon the question, but there was enough to make it a question for the jury.
We are consequently of the opinion that the judgment and order should be affirmed.
So ordered.
Bradley and Childs, JJ., concur.